**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| DERRICK CURRY, individually, and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. _____ |
| v. | |
| CONSUMER SAFETY TECHNOLOGY, LLC D/B/A INTOXALOCK, | **CLASS REPRESENTATION** |
| Defendant. | **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Derrick Curry ("Plaintiff"), individually, and on behalf of all others similarly situated, bring this action against the Consumer Safety Technology, LLC d/b/a Intoxalock ("Intoxalock" or "Defendant"). Plaintiff brings this action by and through his attorneys, and alleges, based upon personal knowledge as to his own actions, and based upon information and belief and reasonable investigation by his counsel as to all other matters, as follows.

## I.      INTRODUCTION

1.      Defendant is the manufacturer of the "Intoxalock" breathalyzer interlocks that are installed and monitored on vehicles. These interlocks require the driver to pass a breathalyzer test before allowing vehicle ignition. These interlocks are an integral part of remedial programs available in most of the 50 states whereby individuals convicted of DUI can continue driving and/or reduce the penalty by agreeing to be monitored for a set period of time.

2.      As the programs are administered by state agencies as part of their respective criminal justice systems, with monitoring and reporting, Intoxalock users must provide to Defendant personally identifying information ("PII") and other sensitive information such as criminal and conviction history to use the interlock. And since Defendant charges a monthly fee

and other fees, such as calibration fees, for the use of the Intoxalock, users must also provide financial account information and payment information to Defendant. The information that Plaintiff and Class members provided to Defendant, and were thus maintained in Defendant's systems, are hereinafter collectively referred to as "Private Information."

3.     On or before March 14, 2026, cybercriminals attacked Defendant's systems and disabled its critical network infrastructure and, upon information and belief, successfully stole the vast quantities of information maintained by Defendant (the "Data Breach" or "Breach").

4.     In addition to theft of Private Information, countless users were unable to use their vehicles for over a week, as the outage disabled countless Intoxalocks across the United States.

5.     The Data Breach was caused by numerous failures and deficiencies on the part of Defendant, and current and former Intoxalock users, Plaintiff and Class members, were damaged as a result.

6.     Accordingly, Plaintiff brings this action on behalf of all those similarly situated to seek relief for, *inter alia*, the consequences of Defendant's failure to reasonably safeguard their Private Information; its failure to maintain the continued operation of critical cloud infrastructure and systems, its failure to reasonably provide timely notification to Plaintiff and Class members that their Private Information had been compromised; its failure to timely and accurately inform Plaintiff and Class members about the consequences of the outage; and for Defendant's failure to inform Plaintiff and Class members concerning the status, safety, location, access, and protection of their Private Information.

## II.     **PARTIES**

### Plaintiff Derrick Curry

7.     Plaintiff Derrick Curry is a resident and citizen of Worth, Illinois, which is a distant suburb of Chicago.

8.      Plaintiff Curry, like most Americans, relies extensively on his vehicle for personal and family transportation. Chiefly, he relies on his vehicle to transport himself to his place of employment, to transport his children to and from school, to transport himself to hospitals, to purchase groceries and run essential errands.

9.      Plaintiff Curry is a participant in Illinois' Monitoring Device Driving Permit program ("MDDP"), as a result of a DUI incident, and he is required to install a Breath Alcohol Interlock Device ("BAIID") in his vehicle, which tests his BAC before enabling the ignition on his vehicle.

10.      On and around January 26, 2026, Plaintiff Curry leased one of Defendant's BAIIDs for use in his vehicle, and he had the lock professionally installed on his vehicle.

11.      As a condition of setting up and using the lock, Plaintiff Curry had to create an online account with Intoxalock, which involved providing his Private Information.

12.      On March 16, 2026, Plaintiff Curry received an email from Defendant explaining that Intoxalock was experiencing a "cybersecurity event" and that Intoxalock was investigating the scope of the event. *See* **Ex. A**. The email explained to Plaintiff Curry that his device will continue operating, but that he may experience some delay in starting his vehicle.

13.      When he received this email on March 16, 2026, Plaintiff Curry had driven his daughter to school, to accompany her on a school field. While he was still at the school with his daughter, he received a notification from his Intoxalock lock, informing him that he will be locked out from starting his vehicle in 2 hours' time.

14.      To avoid having his vehicle disabled and stranded in the school parking lot, Plaintiff Curry had to leave his daughter and abandon the school field trip to take his vehicle home before he would be locked out.

15.     Unfortunately for Plaintiff Curry, as he was driving his vehicle home from his daughter's school, and well before the two-hours elapsed, his vehicle suddenly and dangerously shut off while he was driving down a city street. Plaintiff Curry was unable to restart the vehicle because his Intoxalock had ceased functioning. Plaintiff Curry called Intoxalock customer service and they advised him that Intoxalock was experiencing some technical difficulties and were unable to help him. As a result, Plaintiff Curry was forced to call and wait for a tow-truck to tow his vehicle home, which cost over $700. He also had to find and arrange alternative transportation for his daughter, and she was forced to wait at school for over five hours after returning from her field trip before someone was able to pick her up.

16.     On the morning of March 17, 2026, Plaintiff Curry attempted to start his vehicle to go to work but he was unable to do so because the Intoxalock was still nonfunctional. As he could not find alternative transportation to get to work on time, Plaintiff Curry was forced to call his employer and request a last-minute day of absence, missing a day of work and pay.

17.     On the morning of March 18, 2026, Plaintiff Curry again attempted to start his vehicle to go to work, but he was unable to do so because the Intoxalock was still nonfunctional. When Plaintiff Curry called and informed his employer of the situation, he was fired from his job, due to company policy regarding missed work days.

18.     Now out of a job and with his vehicle still disabled due to the malfunctioning Intoxalock, Plaintiff Curry contacted the Illinois Secretary of State, which supervises Illinois' BAIID and MDDP programs, and an agent advised him to remove the malfunctioning Intoxalock and purchase and install an alternative BAIID.

19.     Removal of a BAIID is made intentionally difficult by design, and Plaintiff Curry sought professional help to remove the Intoxalock and install an alternative lock. As his vehicle

was still disabled, Plaintiff Curry attempted to find a qualified specialist who would be willing to travel to his residence to complete the task in his driveway as a "house call."

20.    After some research, Plaintiff Curry was able to find a qualified specialist who was willing to travel and attempt the task and on and around March 23, 2026, this individual arrived at his house to attempt the removal and replacement. Unfortunately, he was unable to remove the Intoxalock.

21.    Later that same day, Plaintiff Curry, now unwilling to risk the time it would take to find another specialist and desperately needing his vehicle functioning again, borrowed $300 from his brother to pay to have his vehicle towed to the shop that originally installed the Intoxalock. Finally, this shop was able to remove the Intoxalock and start the engine. A full week had elapsed since the Intoxalock ceased functioning.

22.    Plaintiff Curry reasonably believes that the cyberattack which disabled Defendant's systems, and disabled his Intoxalock, made the process of removing and replacing the lock more difficult.

23.    During this difficult week, Plaintiff Curry also began receiving an alarming number of spam emails and spam calls. Even more worryingly, Plaintiff Curry also received a notification informing him that someone applied for loans using his credentials. While Defendant has still not publicly stated if any information was stolen in the Breach, Plaintiff Curry reasonably believes that the perpetrators of the cyberattack on Defendant also stole vast quantities of Private Information belonging to Intoxalock users, including himself.

24.    Concerned with the potential for more identity theft and fraud, Plaintiff Curry signed up for several credit monitoring services, including several paid services. Plaintiff Curry

currently has active credit monitoring through Credit Karma, Credit Sesame ($24.99), Equifax ($19.99 per month), Transunion ($29.99 per month), and Experian.

25.    As a result of the Breach at Defendant's systems, which disabled his Intoxalock and rendered his vehicle useless, Plaintiff Curry lost pay, lost time, lost his employment, had to pay over $1,000 in towing fees, had to pay to have the Intoxalock removed, suffered great inconvenience to his and his family's personal life, and, upon information and belief, had his Private Information, which was maintained on Defendant's systems, stolen and fraudulently used by cybercriminals.

### Defendant Consumer Safety Technology, LLC d/b/a Intoxalock

26.    Defendant Consumer Safety Technology, LLC d/b/a Intoxalock is Iowa limited liability corporation with its principal place of business located at 505 5th Ave, Suite 729, Des Moines, IA 50309. Defendant conducts business in Iowa and throughout the United States.

### III.    JURISDICTION AND VENUE

27.    This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

28.    This Court has personal jurisdiction over Defendant because Defendant is headquartered in Iowa.

29.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims occurred in this District and because Defendant resides in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.    Consumer Safety Technology, LLC – Background

30.    In most states, individuals who are arrested and convicted of a DUI offense are eligible to participate in remedial programs that allow them to continue driving and mitigate the penalties of the offense if they agree to install breathalyzer interlocks on their vehicles and submit to monitoring for a set period of time. These interlocks include a built-in breathalyzer to measure BAC, and program participants must pass a breathalyzer test before the interlock allows vehicle ignition.

31.    While there are multiple companies that produce these interlock devices, the number of manufacturers is limited due to the need to comply with strict regulations that vary state-by-state and the need to coordinate with state law enforcement agencies in compliance monitoring and reporting.

32.    Defendant manufactures, leases, and law enforcement overhead for the Intoxalock Ignition Interlock Devices for use in 46 states across the United States. Intoxalock charges a monthly lease fee of $54.99, a calibration fee of $20 (to be performed every 1-3 months, depending on state requirements), as well as other miscellaneous fees for use of its interlock devices in these programs.

33.    For reporting and monitoring purposes, Intoxalock users (Plaintiff and Class members), must provide their PII and other sensitive information, including details about certain criminal history, to Defendant to use the Intoxalock. This information is then maintained and stored on Defendant's systems as an integral part of its business operations.

34.    Upon information and belief, Defendant failed to implement necessary data security safeguards at the time of the Data Breach. This failure resulted in cybercriminals accessing the Private Information of Intoxalock users.

35.    Intoxalock users, such as Plaintiff and Class members, made their Private Information available to Defendant with the reasonable expectation that any entity with access to this information would keep that sensitive and personal information confidential and secure from illegal and unauthorized access. They similarly expected that, in the event of any unauthorized access, these entities would provide them with prompt and accurate notice.

36.    This expectation was objectively reasonable and based on an obligation imposed on Defendant by statute, regulations, industrial custom, and standards of general due care.

37.    Had they known that Defendant's systems were vulnerable and open to attack, Plaintiff and Class members, as reasonable individuals, would have purchased or leased products from Defendant's competitors, rather than risk the resulting theft of their Private Information and potential errors and malfunctions with the interlock.

38.    Unfortunately for Plaintiff and Class members, Defendant failed to carry out its duty to safeguard sensitive Private Information and provide adequate data security. As a result, it failed to prevent the Data Breach which led to Plaintiff and Class members having their Intoxalocks disabled, thus disabling their vehicles for over week, and having their Private Information stolen by cybercriminals who took advantage of Defendant's lax security.

**B.    The Data Breach**

39.    On March 14, 2026, unknown individuals perpetrated a cyberattack on Defendant's systems. This attack caused a system-wide outage across, and drivers across the country reported that their interlocks had ceased functioning, rendering them unable to start their vehicles.

40. While the breathalyzer test and locking/unlocking was performed locally on the physical hardware, the required calibration was performed "over the cloud" through a connection to Defendant's networks. The applicable laws from the various states require that the calibration be performed every 1-3 months. If a calibration is not performed at the required interval, the Intoxalock disables itself and prevents the vehicle from being started.

41. Thus, any Intoxalock users whose locks required calibration during the system outage were unable to do so and the locks remained disabled until Defendant's systems were restored.

42. On March 16, 2026, Defendant publicly announced the attack and outage, and notified Intoxalock users via email. *See* Ex. A.

43. Defendant was not able to restore its systems until late on March 22, 2026, which was a week after the cyberattack.

C. **Defendant's Many Failures Both Prior to and Following the Breach**

44. Continued operation of Defendant's cloud infrastructure is vital for the continued functioning of Defendant's interlocks. As demonstrated by Plaintiff Curry's sordid experience, the consequences resulting from any outage of Defendant's systems are catastrophic, as it will disable the ignition on users' vehicles. This can be extremely dangerous as the interlock still disables the ignition even when the vehicle is driving on the road. Further, Defendant collects and maintains vast quantities of Private Information belonging to Plaintiff and Class members as part of its normal operations. As such, cybersecurity is vital to Defendant's business operations and the wellbeing of Intoxalock users.

45. Unfortunately, multiple direct, proximate, and foreseeable failings on the part of Defendant lead to the cyberattack which disabled Defendant's systems and, upon information and belief, compromised the Private Information stored therein.

46. First, Defendant inexcusably failed to implement reasonable security protections to safeguard its information systems and databases.

47. Second, upon information and belief, Defendant failed to timely detect the initial attack on Defendant's computer systems, becoming aware of the intrusion only after its systems had been taken down and the stored information was stolen.

48. Third, Defendant failed to inform the public that its data security practices were deficient and inadequate. Had Plaintiff and Class members been aware that Defendant did not have adequate safeguards in place to protect its systems, Plaintiff and Class members would not have purchased or leased an Intoxalock and would not have provided their Private Information to Defendant.

49. Defendant has still not provided details regarding the attack, including any details regarding the theft of Private Information.

**D.    The Age-Old Trade for Stolen Data and the Rise of Data Breaches**

50. While the prevalence and severity of data breaches have increased exponentially over the past five years, the illicit trade of stolen data dates back to the earliest days of the internet. In the 1990s, cybercriminals sold stolen data through Internet Relay Chat (IRC) channels, which were primitive message boards and instant messaging services, before transitioning to dedicated web forums in the early 2000s.[1] These forums became havens for cybercriminals of all stripes

---

[1] Thomas Holt, *How massive data breaches flood illicit markets while personal information fuels cybercrime economy*, Milwaukee Independent (November 12, 2025), available at

where "individuals advertised their services to other users. Forums quickly gained popularity and became successful businesses with vendors selling stolen credit cards, malware, and related goods and services to misuse personal information and enable fraud."[2]

51.    A forum known as ShadowCrew, which operated for just two years before being shut down by a law enforcement task force operation in 2004, served as the most prominent port of call during this era, and its members managed to traffic over 1.7 million stolen credit card details in the brief period of time it was online.[3]

52.    The end of ShadowCrew did not dampen the illicit trade in stolen data. Instead, the trade moved to the dark web where it thrives to this day. Gone are the days of archaic IRC channels and dusty forums; stolen data is now traded on dedicated webpages serving as veritable e-commerce stores (akin to Amazon, eBay, and Alibaba) for stolen data of all kinds, complete with eye-catching webpages, distinct branding, and advertising to attract customers.[4] The vendors operating from these dark web storefronts are "frequently offer discounts and promotions to buyers to attract customers and keep them loyal," and offer clearance sales on old and/or expiring inventory, such as expiring credit card numbers, in a macabre reflection of commercial practices from the right side of the law.[5]

53.    This decades-old black market for stolen data continues to thrive, and stolen PII, PHI, and financial account information are exchanged as simple commodities with prices set by the brutal and invisible hand of economics. Typically, online banking login information can be

---

https://www.milwaukeeindependent.com/syndicated/massive-data-breaches-flood-illicit-markets-personal-information-fuels-cybercrime-economy/.

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *Id.*

purchased for $100 each, full credit card details can be purchased for between $10 and $100, and comprehensive data packages which can enable complete theft of an individual's identity can be purchased for $1,000 or more.[6]

54.    For criminals, the ROI on purchased information can be exceptional despite the dubious nature of black-market dealings and the inherent risks therein. For example, a cybercriminal "who buys 100 cards for $500 can recoup costs if only 20 of those cards are active and can be used to make an average purchase of $30."[7] Based on these incentives, data breaches "are likely to continue as long as there is demand for illicit, profitable data."[8]

55.    In this thriving black market, the producers are the cybercriminals who steal information to sell. And fueled by the voracious demand for stolen data in this thriving black market, dedicated gangs and organized crime rings have stepped up to meet the market demand, which has resulted in a precipitous increase in the number of data breaches in recent years.

56.    The Identity Theft Resource Center's ("ITRC") Annual End-of-Year Data Breach Report for 2024 listed 3,158 total compromises, for which 1,350,835,988 individual victim notices were dispatched.[9] This is just 57 breaches short of 2023's record-breaking total of 3,205 data breaches.[10] But the astronomical figure of 1,350,835,988 victim notices represents a 211% increase

---

[6] Ryan Smith, *Revealed-how much is personal information worth on the dark web?*, Insurance News (May 1, 2023), available at https://www.insurancebusinessmag.com/us/news/breaking-news/revealed--how-much-is-personal-information-worth-on-the-dark-web-444453.aspx.

[7] Thomas Holt, *How massive data breaches flood illicit markets while personal information fuels cybercrime economy*, Milwaukee Independent (November 12, 2025), available at https://www.milwaukeeindependent.com/syndicated/massive-data-breaches-flood-illicit-markets-personal-information-fuels-cybercrime-economy/.

[8] *Id.*

[9] *2024 Data Breach Report*, Identity Theft Resource Center (January 2025), available at https://www.idtheftcenter.org/publication/2024-data-breach-report/.

[10] *2023 Data Breach Report*, Identity Theft Resource Center (January 2023), available at https://www.idtheftcenter.org/publication/2023-data-breach-report/.

over 2023's 353,027,892 victim notices, primarily due to five "mega-breaches" (breaches involving at least 100 million victims) which took place in 2024.[11]

57.    Statista, a German entity that collects and markets data relating to, among other things, data breach incidents and the consequences thereof, confirms that the number of data breaches has been steadily increasing since it began a survey of data compromises in 2005 with 157 compromises reported that year, to a peak of 3,205 in 2023.[12] The number of impacted individuals has also risen precipitously from approximately 318 million in 2015 to 1.35 billion in 2024.[13]

---

[11] *2024 Data Breach Report*, Identity Theft Resource Center (January 2025), available at https://www.idtheftcenter.org/publication/2024-data-breach-report/; *2023 Data Breach Report*, Identity Theft Resource Center (January 2023), available at https://www.idtheftcenter.org/publication/2023-data-breach-report/.

[12] *Annual Number of Data Breaches and Exposed Records in the United States from 2005 to 2024*, Statista (Updated May 23, 2025), available at: https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed.

[13] *Id.*



_Figure 1 – Chart of the Number of Data Breaches and Affected Individuals from 2005 to 2024._ [14]

### E.    How the Theft and Sale of Data Harms Individuals

58.    Individuals who have unfortunately had their information stolen and sold on the black-market face severe consequences which belie the blatant ubiquity of such transactions. Using this stolen information, criminals and other unsavory groups can fraudulently take out loans under the victims' name, open new lines of credit, and cause other serious financial difficulties for victims.[15]

59.    This is exacerbated by the fact that the problems arising from a compromised social security number are exceedingly difficult to resolve. A victim is forbidden from proactively

---

[14] _Id._

[15] United States Social Security Administration, _Identity Theft and Your Social Security Number_, United States Social Security Administration (July 2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

changing his or her number unless and until it is actually misused and harm has already occurred.

And even this delayed remedial action is unlikely to undo the damage already done to the victims:

> Keep in mind that a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.[16]

60.     Further, as data breaches become ever more prevalent and as technology advances, computer programs can scan the internet to create a mosaic of information that could be used to link compromised information to an individual in ways in a phenomenon known as the "mosaic effect." By and through this process, names, dates of birth, and contact information such as telephone numbers and email addresses, hackers and identity thieves can access users' other accounts by, for example, bypassing security questions and 2FA security with the comprehensive collection of information at their disposal.

61.     Thus, because of this effect, cybercriminals and other unauthorized parties could use Plaintiff's and Class Members' Private Information to access, inter alia, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members, even when that specific category of information is not compromised in a given breach.

62.     A particularly trouble example of this effect is the development of "Fullz" packages. A "Fullz" packages is a dosser of information that cybercriminals and other unauthorized parties can assemble by cross-referencing the Private Information compromised in a given data breach to publicly available data or data compromised in other data breaches. Automated programs can and are routinely used to create these dossiers and they typically

---

[16] *Id.*

represent an alarmingly accurate and complete profile of a given individual.

63.     Therefore, through the use of these "Fullz" packages, stolen Private Information from this Data Breach can be easily linked to Plaintiff's and the proposed Class's phone numbers, email addresses, and other sources and identifiers. Thus, even if certain information such as emails, phone numbers, or credit card or financial account were not compromised in this Data Breach, criminals can easily create a Fullz package to sell for profit.

64.     Upon information and belief, this has already transpired (and will continue to transpire) for Plaintiff and the Class. And any reasonable for any trier of fact will find that Plaintiff and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

**F.     Defendant Had a Duty and Obligation to Protect Private Information**

65.     Defendant has an obligation to protect the Private Information belonging to Plaintiff and Class members. First, this obligation was mandated by government regulations and state laws, including FTC rules and regulations. Second, this obligation arose from industry standards regarding the handling of sensitive PII. Plaintiff and Class members provided, and Defendant obtained, their information on the understanding that it would be protected and safeguarded from unauthorized access or disclosure.

**1.     FTC Act Requirements and Violations**

66.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the

Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

67.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[17] The guidelines note businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[18] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[19] Defendant clearly failed to do any of the foregoing, as evidenced by the length of the Data Breach, the fact that the Breach went undetected, and the amount of data exfiltrated.

68.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

69.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and

---

[17] *Protecting Personal Information: A Guide for Business*, Federal Trade Comm'n (October 2016), available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed August 15, 2023).
[18] *Id.*
[19] *Id.*

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

70.     Additionally, the FTC Health Breach Notification Rule obligates companies that suffered a data breach to provide notice to every individual affected by the data breach, as well as notifying the media and the FTC. *See* 16 CFR 318.1, *et seq.*

71.     As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

72.     Defendant was fully aware of its obligation to protect the Private Information of its users. Defendant is a sophisticated and technologically savvy business that relies extensively on technology systems and networks to maintain its basic operations.

73.     Defendant had and continues to have a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between Defendant and Plaintiff and Class members. Defendant alone had the exclusive ability to implement adequate security measures to its cyber security network to secure and protect Plaintiff's and Class members' Private Information.

### 2.     Industry Standards and Noncompliance

74.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

75.    _

76.    Experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

77.    The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[20]

78.    The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

    a.    Control who logs on to your network and uses your computers and other devices.

    b.    Use security software to protect data.

    c.    Encrypt sensitive data, at rest and in transit.

    d.    Conduct regular backups of data.

    e.    Update security software regularly, automating those updates if possible.

    f.    Have formal policies for safely disposing of electronic files and old devices.

---

[20]    *The 18 CIS Critical Security Controls*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls/cis-controls-list (last visited Feb. 11, 2026).

g.  Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

79.  Further still, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including: (i) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (ii) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (iii) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[21]

80.  Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls

---

[21] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations (last visited Feb. 11, 2026).

(CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

81.    Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

## G.    Plaintiff and the Class Suffered Harm Resulting from the Data Breach

82.    Like any data hack, the Data Breach presents major problems for all affected.[22]

83.    The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers and other sensitive data. As the FTC notes, "once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[23]

84.    The ramifications of Defendant's failure to properly secure Plaintiff's and Class members' Private Information are severe. Identity theft occurs when someone uses another person's financial, and personal information, such as that person's name, address, Social Security number, and other information, without permission in order to commit fraud or other crimes.

85.    According to data security experts, one out of every four data breach notification recipients become a victim of identity fraud.

---

[22] Paige Schaffer, *Data Breaches' Impact on Consumers*, Insurance Thought Leadership (July 29, 2021), available at https://www.insurancethoughtleadership.com/cyber/data-breaches-impact-consumers.
[23] *Warning Signs of Identity Theft*, Federal Trade Comm'n, available at https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft.

86.     Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

87.     Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the Class at an imminent, immediate, and continuing increased risk of identity theft and identity fraud. According to a recent study published in the scholarly journal *Preventive Medicine Reports*, public and corporate data breaches correlate to an increased risk of identity theft for victimized consumers.[24] The same study also found that identity theft is a deeply traumatic event for the victims, with more than a quarter of victims still experiencing sleep problems, anxiety, and irritation even six months after the crime.[25]

88.     There is also a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now possess Class members' Private Information will do so at a later date or re-sell it.

89.     Data breaches have also proven to be costly for affected organizations as well, with the average cost to resolve being $4.45 million dollars in 2023.[26] The average cost to resolve a

---

[24] David Burnes, Marguerite DeLiema, Lynn Langton, *Risk and protective factors of identity theft victimization in the United States*, Preventive Medicine Reports, Volume 17 (January 23, 2020), available at
https://www.sciencedirect.com/science/article/pii/S2211335520300188?via%3Dihub.
[25] *Id.*
[26] *Cost of a Data Breach Report 2023*, IBM Security, available at
https://www.ibm.com/reports/data-breach?utm_content=SRCWW&p1=Search&p4=43700072379268622&p5=p&gclid=CjwKCAjwxOymBhAFEiwAnodBLGiGtWfjX0vRlNbx6p9BpWaOo9eZY1i6AMAc6t9S8IKsxdnbBVeUbxoCtk8QAvD_BwE&gclsrc=aw.ds.

data breach involving health information, however, is more than double this figure at $10.92 million.[27]

90.     Here, due to the Breach, Plaintiff and Class members have been exposed to injuries that include, but are not limited to:

a.     Theft of Private Information;

b.     Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the Private Information stolen during the Data Breach;

c.     Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

d.     Costs associated with time spent to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts, including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite Defendant's delay in disseminating notice in accordance with state law;

e.     The imminent and impending injury resulting from potential fraud and identity theft posed because their Private Information is exposed for theft and sale on the dark web; and

f.     The loss of Plaintiff's and Class members' privacy.

91.     Plaintiff and Class members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information being accessed by cybercriminals, risks that will not abate within the limited time of credit monitoring offered by Defendant.

---

[27] *Id.*

92.     As a direct and proximate result of Defendant's acts and omissions in failing to protect and secure Private Information, Plaintiff and Class members have been placed at a substantial risk of harm in the form of identity theft, and they have incurred and will incur actual damages in an attempt to prevent identity theft.

93.     Plaintiff retains an interest in ensuring there are no future breaches, in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both themselves and similarly situated individuals whose Private Information was accessed in the Data Breach.

## V.     CLASS REPRESENTATION ALLEGATIONS

94.     Plaintiff brings this action on behalf of themselves and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States whose Private Information was accessed
> in the Data Breach.

Excluded from the Class are Defendant, its executives and officers, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change or expand the Class definition after conducting discovery.

95.     In the alternative, Plaintiff brings this action on behalf of themselves and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a subclass of:

> All persons in the United States whose Intoxalock devices were disabled
> by the Breach (the "Device Subclass").

Excluded from the Subclass are Defendant, its executives and officers, and the Judge(s) assigned to this case. Hereinafter, both the Class and Subclass shall be collectively referred to as the "Class."

96.     Numerosity: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. The exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process. On information and belief, the number

of affected individuals estimated to be in the tens of thousands The members of the Class will be identifiable through information and records in Defendant's possession, custody, and control.

97.     <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.     When Defendant learned of the Data Breach;

b.     Whether hackers obtained Class members' Private Information via the Data Breach;

c.     Whether Defendant's response to the Data Breach was adequate;

d.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

e.     Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

f.     Whether Defendant owed a duty to safeguard their Private Information;

g.     Whether Defendant breached its duty to safeguard Private Information;

h.     Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class members;

i.     Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class members;

j.     Whether Defendant's conduct violated the FTCA;

k.     Whether Defendant's conduct was negligent;

l.     Whether Defendant's conduct was *per se* negligent;

m.     Whether Defendant was unjustly enriched;

n.     What damages Plaintiff and Class members suffered as a result of Defendant's misconduct;

25

o.     Whether Plaintiff and Class members are entitled to actual and/or statutory damages; and

p.     Whether Plaintiff and Class members are entitled to additional credit or identity monitoring and monetary relief.

98.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Class as Plaintiff and all members of the Class had their Private Information compromised in the Data Breach. Plaintiff's claims and damages are also typical of the Class because they resulted from Defendant's uniform wrongful conduct. Likewise, the relief to which Plaintiff is entitled to is typical of the Class because Defendant has acted, and refused to act, on grounds generally applicable to the Class.

99.    <u>Adequacy</u>: Plaintiff is an adequate class representative because his interests do not materially or irreconcilably conflict with the interests of the Class he seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the Class. Neither Plaintiff nor his counsel have any interests that are antagonistic to the interests of other members of the Class.

100.    <u>Superiority</u>: Compared to all other available means of fair and efficient adjudication of the claims of Plaintiff and the Class, a class action is superior. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action

26

device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendant's records and databases.

## VI.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(By Plaintiff on behalf of the Class and Subclass)**

101.    Plaintiff incorporates and realleges all allegations in paragraphs 1 through 100 as if fully set forth herein.

102.    Defendant owed a duty of care to protect its systems from intrusion and to maintain its continued operation, as all Intoxalock users relied on Defendant's cloud systems being continuously operational to allow them to use their vehicles while complying with applicable state laws. Services which Plaintiff and Class members paid substantial sums monthly for.

103.    Defendant owes a duty of care to protect the Private Information belonging to Plaintiff and Class members.

104.    Defendant also owes several specific duties including, but not limited to, the duty:

    a.    to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

    b.    to protect its systems using reasonable and adequate security procedures and systems compliant with industry standards;

    c.    to have procedures in place to detect any intrusions;

    d.    to have back-up cloud systems or other protocols to allow Intoxalocks to continue functioning with temporary loss of connection;

    e.    to have procedures in place to detect the loss or unauthorized dissemination of Private Information in its possession;

    f.    to employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class members pursuant to the FTCA;

27

g.      to implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

h.      to promptly notify Plaintiff and Class members of the Data Breach, and to precisely disclose the type(s) of information compromised.

105.    Defendant also owes a duty to timely disclose any unauthorized access and/or theft of the Private Information belonging to Plaintiff and Class members. This duty exists to provide Plaintiff and Class members with the opportunity to undertake appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Private Information.

106.    Defendant also owes a duty to timely and accurately inform its users about the consequences of system outages, whether by external attack or not. This is to enable users to take affirmative, mitigating actions with the forewarning that they may be unable to use their vehicles.

107.    Defendant owes these duties according to general standards of due care.

108.    Defendant also owes these duties because it had a special relationship with Plaintiff and Class members. Plaintiff and Class members relied on Defendant's cloud systems being continuously operational to allow them to use their vehicles while complying with applicable state laws. Furthermore, Plaintiff and Class members entrusted their Private Information to Defendant on the understanding that adequate security precautions would be taken to protect this information. Furthermore, only Defendant had the ability to protect its systems and the Private Information stored on them from attack.

109.    Defendant also owes this duty because industry standards mandate that Defendant protect Private Information in its possession and to protect its critical network infrastructure from catastrophic failures, or to mitigate their impact on continued operations.

28

110.    Defendant breached its duties owed to Plaintiff and Class members by failing to take reasonable appropriate measures to secure, protect, and/or otherwise protect and harden its network infrastructure and systems and in failing to safeguard their Private Information.

111.    Defendant also breached the duties it owed to Plaintiff and Class members by failing to timely and accurately disclose to them that their Private Information had been improperly acquired and/or accessed.

112.    Defendant also breached the duties it owed to Plaintiff and Class members by failing to timely and accurately inform its users about the outage and the catastrophic consequences thereof.

113.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members were damaged. These damages include, and are not limited to:

- Lost time, pay, and inconvenience from losing access to their vehicle;

- Towing fees and other costs associated with moving their disabled vehicles;

- Costs associated with removing the nonfunctioning Intoxalocks from their vehicles;

- Lost or diminished value of their Private Information;

- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; and

- Permanently increased risk of identity theft.

29

114. Plaintiff and Class members were foreseeable victims of any inadequate security practices on the part of Defendant and the damages they suffered were the foreseeable result of the aforementioned inadequate security practices.

115. In failing to provide prompt and adequate notice of the Breach and the consequences of the resulting outage and compromised Private Information, Defendant also acted with reckless disregard for the rights of Plaintiff and Class members.

116. Plaintiff and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its network and/or information systems and monitoring procedures, conduct periodic audits of those systems, provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class members, and compensate Plaintiff and Class members for all the costs resulting from having their vehicles disabled.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(By Plaintiff on behalf of the Class and Subclass)**

117. Plaintiff incorporates and realleges all allegations in paragraphs 1 through 100 as if fully set forth herein.

118. Plaintiff and Class members provided Defendant with their Private Information and payment to use Defendant's Intoxalocks.

119. By providing this payment and Private Information, and upon Defendant's acceptance of this payment and information, Plaintiff and the Class, on one hand, and Defendant, on the other hand, entered into implied-in-fact contracts for the provision of data security and continued operation of critical network infrastructure, separate and apart from any express contract entered into between the parties.

120.    The implied contracts between Defendant and Plaintiff and Class members obligated Defendant to take reasonable steps to secure, protect, safeguard, and keep confidential Plaintiff's and Class members' Private Information and to take steps to maintain the continued operation of critical network infrastructure. The terms of these implied contracts are described in federal laws, state laws, and industry standards, as alleged above.

121.    The implied contracts for security also obligated Defendant to provide Plaintiff and Class members with prompt, timely, and sufficient notice of any and all unauthorized access or theft of their Private Information and to provide Plaintiff and Class members with prompt, timely, and accurate notice of any system outage and its consequences.

122.    Defendant breached these implied contracts by failing to take, develop and implement adequate policies and procedures to safeguard, protect, and secure its critical systems and the Private Information belonging to Plaintiff and Class members; allowing unauthorized persons to disable critical systems and render countless Intoxalocks inoperable and access Plaintiff's and Class members' Private Information; and failing to provide prompt, timely, and sufficient notice of the Data Breach to Plaintiff and Class members, as alleged above.

123.    As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiff and Class members have been damaged as described herein, will continue to suffer injuries as detailed above due to the continued risk of exposure of Private Information, and are entitled to damages in an amount to be proven at trial.

### COUNT III
### UNJUST ENRICHMENT
### (By Plaintiff on behalf of the Class)

124.    Plaintiff incorporates and realleges all allegations in paragraphs 1 through 100 as if fully set forth herein.

125.    This count is brought in the alternative to Count II.

126.    Plaintiff and the Class have a legal and equitable interest in their Private Information that was collected and maintained by Defendant and in the continued functioning of the Intoxalocks.

127.    Plaintiff and the Class conferred payments and their Private Information to Defendant as a necessary condition of using Defendant's Intoxalocks.

128.    Plaintiff and Class members conferred payment and Private Information with the understanding that the payment was, in part, to be used to implement data security sufficient to adequately protect Defendant's systems from a catastrophic outage and to protect their Private Information. And this payment represented a benefit that was to be used for a specific purpose.

129.    Defendant received payment and Private Information. Plaintiff and Class members conferral of their payment and Private Information was a direct benefit since Defendant was able to use this information for business purposes and financial gain. There was an understanding that a portion of the monies Defendant received, was intended to be used to implement data security sufficient to adequately protect its systems and Plaintiff and Class members' Private Information.

130.    Defendant understood that it was so benefitted.

131.    However, instead of providing a reasonable level of security, training, protocols, and other measures that would have prevented the Data Breach, as described in detail above, Defendant, upon information and belief, knowingly and opportunistically elected to increase its own profits at the expense of Plaintiff and Class members by not expending the money required to do so.

132.    And in failing to expend the monies conferred with the express understanding that it would be used on data security, Defendant knowingly and deliberately enriched itself at the

expense of Plaintiff and Class members.

133. Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiff and Class members in an unfair and unconscionable manner.

134. Defendant is therefore liable to Plaintiff and the Class for restitution in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically the value to Defendant of the Private Information that was accessed and exfiltrated in the Data Breach and the profits Defendant made through underfunding security measures. Plaintiff and Class members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant, as follows:

A. That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's Counsel as Class Counsel;

B. That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

C. That the Court award Plaintiff and Class members compensatory, consequential, and general damages in an amount to be determined at trial;

D. That the Court award Plaintiff and Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

E. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

F. That the Court award pre- and post-judgment interest at the maximum legal rate;

G.      That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

H.      That the Court grant all other relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and the putative Class, demands a trial by jury on all issues so triable.

Date: March 26, 2026

Respectfully Submitted,

*/s/ J. Barton Goplerud*

**J. Barton Goplerud, AT00002983**
**Brian O. Marty, AT0011622**
SHINDLER, ANDERSON, GOPLERUD &
WEESE, P.C.
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265-5749
Telephone: (515) 223-4567
Facsimile: (515) 223-8887
Email: goplerud@sagwlaw.com
      marty@sagwlaw.com

Daniel O. Herrera*
Nickolas J. Hagman*
Alex Lee*
**CAFFERTY CLOBES MERIWETHER**
**& SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
nhagman@caffertyclobes.com
alee@caffertyclobes.com

* *Pro Hac Vice* forthcoming

*Attorneys for Plaintiff and the Proposed Class and Subclass*

34